**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

Walmed Pharmaceuticals, Ltd., LLC,

    Plaintiff,

v.

Hi-Tech Pharmacal Co., Inc.,

    Defendant.

Case No. 1:07cv810

Judge Michael R. Barrett

## ORDER

This matter is before the Court pursuant to Defendant's renewed motion for summary judgment (Doc. 59). Plaintiff filed a memorandum in opposition (Doc. 76) and Defendant's replied (Doc. 85).

I.    Factual Background

Hi-Tech Parmacal Co., Inc. ("Hi-Tech") and Schrader & Associates, LLC ("S&A") entered into a brokerage agreement, effective August 1, 2002, whereby S&A would act as a broker and market, to Walgreens, four generic drugs, known as Tannates, manufactured by Hi-Tech. (Doc. 59, Exh. A). S&A partnered with Walmed Pharmaceuticals, Ltd., LLC ("Walmed") since Walmed had the necessary contacts with Walgreens. (Doc. 61, p. 23; Doc. 36, pps. 37-38). Hi-Tech's president, David Seltzer ("Seltzer") was made aware of this partnership during the negotiations of the 2002 agreement. (Doc. 33, pps. 30, 55, 74).

In 2003, Walmed, through its CEO David Walker ("Walker"), spoke to Seltzer and stated that Walmed would be the broker for the August, 2003 renewal of the Brokerage Agreement instead of S&A. (Doc. 36, p. 87). As such, Hi-Tech and Walmed entered into a Brokerage Agreement virtually identical to the agreement S&A had signed the previous

year. (Doc. 59, Exh B).

Under the terms of the 2003 Agreement, as well as subsequent agreements, Walmed earned brokerage fees. (Doc. 59, Exhs. B-E). The compensation formula was set up so that Walmed and Hi-Tech were to split the "net profits" evenly. "Net profits" were defined as gross sales less (i) 7% for certain discounts and rebates; (ii) applicable new store discounts as determined by Walgreens; and (iii) the Costs of the Goods as set forth in the contract or in a schedule attached to the contract. (See Doc. 59, Exhs. B-E). "Cost of Goods" was a defined term in the agreements.

In the 2002 agreement with S&A the "Cost of Goods" was defined as $8.50 per unit of each product. Walmed alleges that Hi-Tech represented to Scott Schrader ("Schrader"), the principle of S&A, who then represented to Walmed, that the "Cost of Goods" of $8.50 was approximately the cost of manufacturing the product or the "actual cost" of the goods. (Doc. 61, pps. 25-27, 30; Doc. 36, pps. 138, 198-199). Seltzer further explained to Schrader that the supply of raw materials for the Tannates was difficult to obtain and that this difficulty caused the "Cost of Goods" to be $8.50. (Doc. 61, pps. 26, 29, 61-62). Based upon the representations of Seltzer to S&A, Schrader and Walmed believed that the "Costs of Goods" were "basically pretty close" to the actual costs or were, in fact, the actual costs. (Doc. 36, p 198; Doc. 61, p. 25 ). However, Seltzer states that the "Cost of Goods" did not reflect the actual manufacturing costs but that the "Costs of Goods" included an undisclosed profit to Hi-Tech for having to use a broker. (Doc. 33, pps. 25-26). Seltzer further implies that Schrader knew there was profit built into the "Costs of Goods." (Doc. 33, p54-55) which Schrader denies. (Doc. 61, pps. 26, 30).

The definition of "Cost of Goods" remained the same in the 2003 agreement

2

between Walmed and Hi-Tech. According to Mr. Walker, the parties did not discuss the $8.50 price term at that time. (Doc. 36, p. 79). The same can be said for the 2004 agreement. However, after the 2004 agreement was signed, Walker became aware that a competitor offered to dramatically underprice its bid for one of the products, Tannate-12 Suspension. In response, Seltzer offered to reduce the contractual "Cost of Goods" figure to $4.25 to retain the account with Walgreens. (Doc. 36, pps. 107-108). When Walmed sought a similar reduction of the "Cost of Goods" figure for the other products, Hi-Tech refused. Despite, Hi-Tech's refusal to lower the "Cost of Goods" figure on the other products, the parties entered into a new 2004 agreement that lowered the "Cost of Goods" for Tannate-12 Suspension to $4.25 but left the others at $8.50. This new 2004 agreement also added a new product identified as "Generic for Tanafed DMX Suspension" with a "Cost of Goods" of $4.50 per unit of product. (Doc. 59, Exh. D). Walmed states that Seltzer agreed to lower the "Cost of Goods" for the Tannate-12 Suspension and "take a hit" in order to keep the business at Walgreens. (Doc. 36, pps. 139-140).

The parties then entered into one final Brokerage Agreement effective August 1, 2005 with the same "Cost of Goods" definition as in the new 2004 agreement. (Doc. 59, Exh. E). This Agreement automatically rolled over into a new one year term when neither party elected to terminate or renegotiate a new contract. In late 2005 or early 2006, Hi-Tech received notice that Walgreens was changing its procurement policy for certain products, including Tannates, to a live online auction process. (Doc. 36, pps. 182-184; Doc. 33, p. 60.) As a result of this change, the list price for the products declined substantially and Walmed began to suspect that the "Cost of Goods" was higher than the actual costs to produce. (Doc. 36, p. 137).

3

At about this same time, Walgreens charged a "transition fee" to Hi-Tech for products it retained in stock. One transition fee totaled $84,285.59, the other $94,285.66. (Doc. 34-26, Ex. Z). Walgreens reasoning for the transition fees was a "price protection," i.e., a means of recouping costs on product already purchased at the higher price and held in Walgreens' inventory. (Doc. 34, pps. 52-54). Because the transition fees reflected a reduction in price on products in Walgreens' inventory, Hi-Tech treated them as a reduction in gross sales and subtracted half of the fees from Walmed's commissions. (Doc. 34, pps. 53-54). Walmed believes that the deduction of the transition fees was improper.

In addition, Walmed states that Hi-Tech made other improper deductions when it calculated Walmed's share of the net profits by deducting for chargebacks for new store openings that were not related to the Brokerage Agreements (see Doc. 36, pps. 125-126, 208-209, 220), by using incorrect pricing for certain drugs, and by deducting legal fees incurred by Hi-Tech that Walmed did not agree to share (see Doc. 36, pps. 122-123).

After this lawsuit was filed, Walmed served a subpoena on Walgreens for documents relating to its purchases of Tannates from Hi-Tech. Walmed alleges that these documents show that Walgreens purchased more units then what Hi-Tech reported to Walmed which leaves a deficit of $3,290,035.00 still owed to Walmed. (Doc. 40-1, ¶3).

Hi-Tech terminated the Agreement effective July 31, 2007.[1]

II.   Argument of the Parties

Walmed now alleges that Hi-Tech breached the contracts by misrepresenting that "Cost of Goods" was the actual costs to produce when that was not the case, by taking

---

[1] The termination is not the subject of this litigation.

improper deductions, by misreporting its sales to Walgreens, and that Hi-Tech breached an implied duty of good faith and fair dealing, as well as committed fraud.

Hi-Tech argues that it is entitled to summary judgment for the following reasons: (1) The term "Cost of Goods" is unambiguously defined in the Agreements as the precise dollar figure agreed to by the parties for each unit of each product;(2) under the unambiguous terms of the Agreement, the transition fees charged by Walgreens constituted a reduction of gross sales of the product and thus were properly subtracted from brokerage fees paid to Walmed; (3) in the absence of a claim for breach of contract, Walmed's claim for breach of the covenant of good faith and fair dealing fails because Hi-Tech acted in accordance with the express terms of the contract; and (4) no fraud was committed because Walmed knew that the "Costs of Goods" was not the actual costs to produce the product.

III. <u>Legal Analysis</u>

A. <u>Standard of Review</u>

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden of production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The mere existence of a

5

scintilla of evidence to support the non-moving party's position will be insufficient; the evidence must be sufficient for a jury to reasonably find in favor of the non-moving party. *Id.* at 252.

### B. Breach of Contract - Cost of Goods

Construction of a written contract is a matter of law to be determined by the court. *Latina v. Woodpath Development Co.*, 57 Ohio St.3d 212, 214 (Ohio, 1991). As a general rule, contracts should be construed so as to give effect to the intention of the parties. *Aultman Hosp. Ass'n v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 53 (Ohio, 1989). In construing a contract, a court "must give meaning to every paragraph, clause, phrase, and word, omitting nothing as meaningless, or surplusage" and must consider the subject matter, nature, and purpose of the agreement." *Affiliated FM Insurance Co. v. Owens-Corning Fiberglas Corp.*, 16 F.3d 684, 686 (6th Cir. 1994).

Defendant argues that the term "Cost of Goods" is unambiguously defined in the agreements as the precise dollar figure agreed to by the parties for each unit of product. Therefore, Defendant argues, that the Court can not interpret the contract. Plaintiff counters that although it may "appear" clear on its face, "Costs of Goods" is actually a latent ambiguity since the Defendant misrepresented that the "Cost of Goods" was its actual costs to manufacture the products when it is now know that it is not. Plaintiff further argues that the definition of "Costs of Goods" in the industry is the actual costs to manufacture. Plaintiff argues that this gives rise to two or more possible meanings for "Costs of Goods" - either $8.50 as the contract defines the term or the actual costs to manufacture.

Extrinsic evidence is admissible only if a contract is unclear or ambiguous. *Gencorp, Inc. v. American Int'l Underwriters*, 178 F.3d 804, 818 (6th Cir. 1999). "An ambiguity exists only where a term cannot be determined from the four corners of the agreement or where contract language is susceptible to two or more reasonable interpretations." *Id.* quoting *Affiliated FM Insurance Co. v. Owens-Corning Fiberglas Corp.*, 16 F.3d 684, 686 (6th Cir. 1994)(internal quotation omitted). Ambiguities may be patent or latent. "A latent ambiguity arises when language is clear on its face, but some intrinsic fact or extraneous evidence gives rise to two or more possible meanings." *Id.*

The Contract[2] provides that the "Hi-Tech shall pay to [Walmed] Fifty Percent (50%) of the Net Profits (as defined in Section 3.2)." "'Net Profits' shall mean gross sales of the Products, less... Cost of Goods. 'Cost of Goods' shall be equal to $8.50 per unit of the Products[3]."

The contract language is unambiguous on its face. Because Plaintiff alleges a latent ambiguity the Court will consider extrinsic evidence to determine if such an ambiguity exists. Here, Schrader testified that when the "Cost of Goods" was negotiated it was represented that it would be Hi-Tech's actual manufacturing costs which Schrader testified he was lead to believe was $8.50. However, even considering this testimony, the contract term is not ambiguous. "Cost of Goods" as defined in the contract is not susceptible to more than one meaning. It is a defined term which means $8.50. There is no other way to interpret that phrase. Doing as Plaintiff asks requires the Court to ignore the specified

---

[2]Although there are several contracts, the relevant language in each is essentially the same.

[3]This dollar figure changes in regards to certain drugs in later contracts; however, the definition of "Cost of Goods" in all the contracts is equal to a certain specified dollar amount.

dollar amount as set forth in the contracts. Now, this is not to say that Hi-Tech may not have committed fraud during the negotiation. However, that issue will be discussed in more detail below. Because the Court is constrained by the four corners of the complaint, the motion for summary judgment as to the breach of contract on the issue of "Costs of Goods" is granted.

### C. Breach of Contract - Improper Deductions

Walmed alleges in its brief in opposition to summary judgment that Hi-Tech took numerous improper deductions, including new store opening chargebacks, alleged legal fees, charging the wrong price on sales through Cardinal, and transition fees. However, the Amended Complaint only alleges a wrongful deduction for transition fees as well as Hi-Tech unilaterally lowering the prices on two of the drugs it was selling to Walgreens which created a negative commission. Hi-Tech only moved for summary judgment as to the transition fees but responded to Walmed's argument as to the other deductions in its reply brief.

As to the transition fees, after Walgreen's switched to an on-line bidding process, it charged transition fees to Hi-Tech for product that it retained but was originally purchased for a higher price than what the product was obtained for through the on-line auction. Hi-Tech, in turn, passed these charges on to Walmed. Hi-Tech argues that the contract allowed Hi-Tech to charge these expenses to Walmed because the charges are essentially a reduction in the gross sales. However, it is clear that neither party anticipated that such charges would be incurred due to Walgreen's switch to on-line bidding process. Furthermore the contract provides that the parties are to split the net profits evenly. Gross sales is not a defined term in the contact. Defendants argue that gross sales means the

unit price times the units sold and that the transition fees charged by Walgreens lowered the unit price of those drugs previously sold to Walgreens, thus, becoming a legitimate deduction. Walmed's only response to Hi-Tech's arguments, found in the section relating to breach of the duty good faith and fair dealing, is that the contract does not allow for the charging of transition fees. (See Doc. 76, p35).

Since the contract is silent as to the charging of transition fees and does not define gross sales, the contract is ambiguous as to this issue. Thus, a jury must determine the intent of the parties.

As to the other deductions, Hi-Tech argues that there is no admissible evidence to support Wal-Med's argument. However, Walker testified in his deposition, that the items were improperly deducted from funds due and owing to him. See Doc. 36, pps 122-130. Specifically, in relation to the deduction for legal fees, although not required by the contract, Wal-Med agreed to the deduction for legal fees for two quarters. In addition, Hi-Tech's own documents seem to show that a 15% deduction for legal fees was taken for at least all of 2005, if not for part of 2006 as well. See Doc. 35-6, pps, 1, 16, 23, 30, 32, 33, 37 and Doc. 34-7, p2). Thus, clearly there is a question of fact as to this issue.

As to the new store chargebacks and the wrong price allocations, Walker is permitted to testify as to his understanding of the deductions and whether, based upon his experience and his role in the transactions, they were improperly withheld. Since he has stated that he believes that they were improperly withheld, a question of fact exists as to these two issues as well.

        D.     <u>Breach of Contract - Under Reporting</u>

Walmed alleges that Hi-Tech under reported its sales of Tannate drugs to

Walgreens.  This allegation comes as a result of documents Walmed received from Walgreens by way of subpoena.  Hi-Tech alleges that it did not under report its sales and if Walgreens did receive more shipments than Hi-Tech has reported those shipments have not been paid for.  Hi-Tech alleges that it properly reported its sales and its accounts receivables from Walgreens.  Hi-Tech produced its own records to support its argument and Walmed produced spreadsheets from Walgreens as well as a summary prepared by Walker to support its argument.  Based upon these competing documents, a question of fact exists.  Although Hi-Tech argues that the documents relied upon by Walmed are not admissible, the Court finds that they are admissible at this time.  Furthermore, the contract provides that "the amount of remuneration payable to Broker under this Section shall be determined in accordance with data supplied by Walgreens."  (See Section 3.1 of the contracts).  Thus, it naturally follows that Walmed may rely on the documents supplied by Walgreens.

### E. Breach of Good Faith and Fair Dealing

Under Ohio law, there is an implied duty of good faith in almost every contract. *DavCo. Acquisition Holding, Inc. v. Wendy's Int'l, Inc.*, 2008 U.S. Dist. LEXIS 27108, 8-9 (S.D. Ohio Mar. 18, 2008) *citing Littlejohn v. Parrish*, 163 Ohio App.3d 456, 462, 2005 Ohio 4850, 839 N.E.2d 49 (2005). "The duty of good faith requires the parties to deal reasonably with each other, and it applies where one party has discretionary authority to determine certain terms of the contract." *Id*.  "Good faith 'is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the

parties[,]' but the obligation 'is not an invitation to the court to decide whether one party ought to have exercised privileges expressly reserved in the document.'" *Id. quoting Ed Schory & Sons, Inc. v. Francis,* 75 Ohio St. 3d 433, 1996 Ohio 194, 662 N.E.2d 1074 (1996)(internal citations omitted).

Without question, this applies to the issue of negative commissions. Although Seltzer testified that he has seen negative commissions in the industry, he also testified that negative commissions were not contemplated by the parties. (See Doc. 33, p85). In addition, when the first contract was signed, Walmed was the party that was dealing with Walgreens and setting the price. However, after Walgreens transferred to the on-line bidding system, these dealings were done by Hi-Tech who then had to greatly reduce the price of the product in order to obtain the business. In 2004 when Walmed learned that a competitor had seriously undercut its bid for Tannate-12 Suspension, Walmed approached Hi-Tech and discussed the situation. At that time Hi-Tech and Walmed agreed to lower the "Cost of Goods" in order to keep the business at Walgreens. Later, when the process changed and Hi-Tech was the one doing the bidding, it drastically lowered the price on two products without consultation with Walmed. By doing so, a jury could find that Hi-Tech took advantage of Walmed since the price it was agreeing to sell the product at was very close to, or below, the "Costs of Goods" as defined in the contracts. Furthermore, since Hi-Tech was allegedly making an undisclosed profit from the sale, only Walmed was being subjected to a loss. Thus, a question of fact exists as to this claim.

  F. <u>Fraud</u>

"To prove fraud or fraudulent inducement, a plaintiff must establish '(1) a false

representation concerning a fact or, in the face of a duty to disclose, concealment of a fact, material to the transaction; (2) knowledge of the falsity of the representation or utter disregard for its truthfulness; (3) intent to induce reliance on the representation; (4) justifiable reliance upon the representation under circumstances manifesting a right to rely; and (5) injury proximately caused by the reliance.'" *Micrel, Inc. v. TRW, Inc.*, 486 F.3d 866, 874 (6th Cir. 2007) *quoting Lepera v. Fuson*, 83 Ohio App. 3d 17, 613 N.E.2d 1060, 1063 (Ohio Ct. App. 1992).

Here, Walmed has sufficiently set forth evidence to create a genuine issue of fact as to this issue. Schrader testified that he was told by Seltzer that "Costs of Goods" was equal to the cost to produce the product and that it did not include any profit. (See Doc. 61, pps 25-30). When Schrader inquired into why the cost was so high, he was told that it was due to raw supply issues - a fact that Schrader had no reason to doubt since his previous manufacturer had supply problems. (Id. at p26). He further testified that he relied on this representation. (Id. at pps 32-33). Seltzer then testified that "Costs of Goods" as defined in the contract had nothing to do with Hi-Tech's actual costs to produce the product. (Doc. 33, p25). Although Walmed admits that it did not discuss the "Cost of Goods" with Hi-Tech, it does state, through Walker, that Walmed relied upon the information that Schrader told him. (Doc. 36, pps 198-199). The evidence is also clear that Seltzer knew Walker and Walmed to be partners of Schrader and S&A. (Doc. 33, pps 30, 55, 74). Walmed also sufficiently alleges damage due to Hi-Tech's misrepresentations.

Hi-Tech argues that no fraud occurred. Seltzer states that Schrader told him the price that Schrader could sell the products to Walgreens and that Seltzer then told Schrader what price he would be willing to transfer those products for. Seltzer states that

12

the profit would be split off of what he was willing to transfer those products for, i.e., what later came to be the "Costs of Goods" as defined in the contract. (See Doc. 33, p25). Walmed could not have believed that the "Cost of Goods" was the actual costs of manufacturing since Hi-Tech agreed to lower the "Cost of Goods" of one of the products to $4.25 in 2004. However, Walker testified that he believed Hi-Tech was taking a hit on that product to keep it at Walgreens. Walker states that he believed that the actual "Costs of Goods" was still closer to $8.50. Based upon the conflicting testimony, a genuine issue of fact exists as to this claim.

    IV.    Conclusion

For the reasons set forth more fully above, the motion for summary judgment is GRANTED, in part, and DENIED, in part. This matter shall proceed to trial as previously scheduled.

**IT IS SO ORDERED.**

    *s/Michael R. Barrett*
    UNITED STATES DISTRICT JUDGE